**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| WILLIAM Q. RICHARDS ESTATE,<br><br>   Plaintiff,<br><br>v.<br><br>CARET TX 144, LLC; CARET TX 145, LLC;<br>CARET, LLC; CARET DECIMAL, LLC;<br>INNOVATIVE SOLAR VENTURES I, LLC;<br>INNOVATIVE SOLAR SYSTEMS, LLC;<br>VIVOPOWER USA, LLC; and VIVOPOWER<br>INTERNATIONAL, PLC<br><br>   Defendants. | Case No. 7:22-cv-00050-O |

## FIRST AMENDED COMPLAINT

### ** TRIAL BY JURY DEMANDED**

The William Q. Richards Estate (hereinafter, "WQR Estate" or "Estate") hereby files this

Amended Complaint against Defendants Caret TX 144, LLC (hereinafter, "Caret TX 144"); Caret

TX 145, LLC (hereinafter, "Caret TX 145"); Caret, LLC (hereinafter, "Caret"); Caret Decimal,

LLC (hereinafter, "Caret Decimal"); Innovative Solar Ventures I, LLC (hereinafter "Innovative

Solar Ventures"); Innovative Solar Systems, LLC (hereinafter, "Innovative Solar Systems");

VivoPower USA, LLC (hereinafter, "VivoPower USA"), and VivoPower International PLC

(hereinafter, "VivoPower International") (collectively, "Defendants") and alleges as follows:

1

## I.  PRELIMINARY STATEMENT

Cottle County has one of the lowest tax bases in the State of Texas. Out of the 254 counties in the Lone Star State, the County tax base ranks 252nd. The county seat of Paducah, population 1,063, is the only town in the county and has watched as its population has steadily dropped year after year. The county is remote and desolate, roughly two hours from cities such as Lubbock and Wichita Falls. The county is desperate for industry and economic development, like so many rural communities across the state.

On February 7, 2022, two Public Notices appeared in the county's local weekly newspaper, *The Paducah Post*, concerning applications submitted to the county to create two reinvestment zones and enter into tax abatement agreements. The two proposed reinvestment zones included acreage belonging to the WQR Estate, the Plaintiff.  Lara K. Richards, executrix of the Estate, was told by Cottle County Judge Karl Holloway that the applicants – Innovative Solar 144, LLC and Innovative Solar 145, LLC – intended to construct and operate two solar farms on land neighboring her family's land. The reality, however, is that a consortium of the Defendants plans to build the two solar farms in order to power two massive crypto mine facilities to be constructed directly adjacent to the Paducah City Limits – just across the road from homes, churches, and the town's only cemetery.

The size and location of the planned Cottle County projects will undoubtedly produce incessant noise and cause great disruption to life in Paducah, judging from the disputes and lawsuits that have arisen across the U.S. and beyond relating to crypto mines. Numerous news articles recount the complaints from local residents about crypto mines:

- "An Appalachian town was told a bitcoin mine would bring an economic boom. It got noise pollution and an eyesore." (Limestone, Tenn. March 18, 2022, *The Washington Post*)

- "Just three years ago, a new kind of mining project started in the middle of one local community leaving many of the residents unhappy about the loud noise the company makes. What neighbors describe as a loud helicopter-like noise echoes through the community day and night." (Adel, Ga. December 5, 2021, www.wfxl.com Fox31)

- "Since January 2021, the 28,000 citizens in Cherokee County, North Carolina, have dealt with 24/7 noise and vibration from a Bitcoin mining facility." (May 2, 2022, *The Daily Beast*)

- "Bitcoin Mining Noise Drives Neighbors Nuts – A Giant Dentist Drill That Won't Stop. Cryptocurrency operations require banks of computers and fans to cool them, and the din is making people who live nearby frazzled." (Sherbrooke, Quebec November 12, 2021, *The Wall Street Journal*)

- "Davey Funderbunk said he and his wife and kids can no longer hear the peaceful sound of the Nolichucky River in the mornings and evenings. It's drowned out by the incessant hum made by dozens of fans cooling computer equipment at a bitcoin mine more than a mile from their rural home." (Jonesborough, Tenn. July 27, 2021, www.wjhl.com NewsChannel 11)

If constructed, the Defendants' crypto mines will create significant disruption and greatly decrease the quality of life in the small rural community.  Well aware of these inevitable consequences and of possible pushback from the community, Judge Holloway omitted that the Cottle County projects included crypto mining in his discussions with Ms. Richards, assuring her that the planned projects were "just two solar farms." Similarly, at a Public Hearing about the projects, a representative from what the public thought was Innovative Solar concealed the true identities of the projects' developers and the true scope of the Defendants' crypto-mining intentions – namely that the solar farms would be constructed **only if** the crypto mining facilities were constructed. Importantly, the Innovative Solar representative failed to tell county residents that the Defendants had already committed the Cottle County solar farms to a new crypto mining venture. These numerous misrepresentations and omissions robbed Cottle County residents, especially the WQR Estate, of the chance to make any informed decisions regarding the projected plans for the community.

3

The WQR Estate owns 495 acres of land that were improperly included in the reinvestment zones and tax abatement agreements. The Estate brings the Instant Action in response to the misrepresentations and omissions the Defendants made regarding their identities and the true scope of the Cottle County projects, which directly caused the WQR Estate's land to be wrongfully included in the reinvestment zones and tax abatement agreements, as discussed more fully below.

## II. PARTIES

1.      Plaintiff WQR Estate is an estate established in and organized under the laws of the State of Texas following the death of William Q. Richards on February 5, 2016. Mr. Richards was a Texas resident and citizen at the time of his death. The Estate's legal address is 1637 U.S. Hwy 83 South, P.O. Box 546, Paducah, Texas, 79248. Lara K. Richards, undersigned counsel, is executrix of the WQR Estate.

2.      Defendant Caret TX 144, formerly known as Innovative Solar 144, LLC ("Innovative Solar 144"), is a limited liability company organized and existing under the laws of the State of North Carolina, and it designs, builds, finances, and operates solar power plants. Its principal place of business is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166, and it may be served through its registered agent, James Tindal-Robertson, 1095 Hendersonville Road, Asheville, North Carolina, 28803. Caret TX 144's managing member is Innovative Solar Ventures. Upon information and belief, Caret TX 144 is not registered or authorized to do business in the State of Texas, and its managing member, Innovative Solar Ventures, and its member(s) is/are not citizen(s) of the State of Texas.

3.      Defendant Caret TX 145, formerly known as Innovative Solar 145, LLC ("Innovative Solar 145"), is a limited liability company organized and existing under the laws of the State of North Carolina, and it designs, builds, finances, and operates solar power plants. Its

principal place of business is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166, and it may be served through its registered agent, James Tindal-Robertson, 1095 Hendersonville Road, Asheville, North Carolina, 28803. Caret TX 145's managing member is Innovative Solar Ventures. Upon information and belief, Caret TX 145 is not registered or authorized to do business in the State of Texas, and its managing member, Innovative Solar Ventures, and its member(s) is/are not citizen(s) of the State of Texas.

4.     Defendant Caret is a limited liability company organized and existing under the laws of the State of New York, and it designs, builds, finances, and operates solar power plants. According to its website – https://caretp2x.com/ -- it is a wholly owned subsidiary of VivoPower International and is the owner of 12 solar projects in the United States. Upon information and belief, two of these projects are the projects planned for Cottle County, Texas, discussed herein. Its principal place of business is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166, and it may be served through its registered agent, Northwest Registered Agent LLC, 90 State Street, Suite 700, Office 40, Albany, New York 12207. Upon information and belief, Caret is not registered or authorized to do business in the State of Texas, and its member(s) is/are not citizen(s) of the State of Texas.

5.     Defendant Caret Decimal is a limited liability company organized and existing under the laws of the State of Delaware, and it is a renewable powered digital asset mining business launched by Caret in 2021. Upon information and belief, its principal place of business is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166, and it may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Upon information and belief, Caret Decimal is not registered or authorized to do business in the State of Texas, and its member(s) is/are not citizen(s) of the State of Texas.

6.      Defendant Innovative Solar Ventures is a limited liability company organized and existing under the laws of the State of Delaware, and it designs, builds, and operates solar power plants. It is the managing member of Caret TX 144 and Caret TX 145. Its principal place of business is 1095 Hendersonville Road, Asheville, North Carolina, 28803, and it may be served through its registered agent, Innovative Solar Systems, LLC, 1095 Hendersonville Road, Asheville, North Carolina, 28803. Innovative Solar Ventures' managing member is Innovative Solar Systems. Upon information and belief, Innovative Solar Ventures is not registered or authorized to do business in the State of Texas, and its managing member is not a citizen of the State of Texas, and its member(s) is/are not citizen(s) of the State of Texas.

7.      Defendant Innovative Solar Systems is a limited liability company organized and existing under the laws of the State of North Carolina, and it designs, builds, and operates solar power plants. It is the managing member of Innovative Solar Ventures. Upon information and belief, Innovative Solar Systems – as the Sole Member/Manager of Innovative Solar 144 and Innovative Solar 145 – was the signatory to the two solar farm lease agreements with the Biddy Family (defined infra) that were executed in 2016. Innovative Solar Systems' principal place of business is 59 Florian Lane, Fletcher, North Carolina, 28732. Upon information and belief, Innovative Solar Systems is registered and authorized to do business in the State of Texas, and it may be served through its registered agent, Corporation Service Company, d/b/a CSC-Lawyers Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701.  The managing members of Innovative Solar Systems are John E. Green, 59 Florian Lane, Fletcher, North Carolina, 28732, and Richard H. Green, 99 Distant View Drive, Asheville, North Carolina, 28803. Upon information and belief, neither of the managing members of Innovative Solar Systems is a citizen of the State of Texas, and none of the member(s) is/are citizens of the State of Texas.

8.      Defendant VivoPower USA is a limited liability company organized and existing under the laws of Delaware, and it is a sustainable energy developer in sectors ranging from battery technology to electric vehicles to solar power.  As discussed more fully below, VivoPower USA, with the below business address, was included as the point of contact for any inquiries regarding the tax abatement agreements executed between Cottle County and Innovative Solar 144 and Innovative Solar 145. VivoPower USA is registered and authorized to do business in the State of Texas. Its principal place of business is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166, and it may be served through its registered agent, Corporation Service Company dba CSC-Lawyers Incorporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, none of the managing member(s) of VivoPower USA is/are citizen(s) of the State of Texas, and none of the member(s) is/are citizen(s) of the State of Texas.

9.      Defendant VivoPower International is a public international company organized under United Kingdom law. It is registered and authorized to do business in the State of New York, and it is a sustainable energy developer in sectors ranging from battery technology to electric vehicles to solar power. Upon information and belief, its principal place of business in the United Kingdom is 34-37 Liverpool Street, London, EC2M- 7PP, United Kingdom, and its principal place of business in the United States is 44873 Falcon Place, Suite 174, Sterling, Virginia, 20166. It may be served through its registered agent, Corporation Service Company, 80 State Street, Albany, New York, 12207. Upon information and belief, VivoPower International is not registered or authorized to do business in the State of Texas, and its member(s) is/are not citizen(s) of the State of Texas.

### III.  JURISDICTION AND VENUE

10.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000, exclusive of interests and costs, and, upon information and belief, complete diversity exists between all adverse parties.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because the WQR Estate resides in this district, the reinvestment zones and tax abatement agreements at issue in this Matter concern property in this district, and a substantial portion of the conduct that is the subject of this Instant Action occurred in this district.

### IV. STATEMENT OF FACTS

**A.  The February 7, 2022, Public Notices and Ms. Richards' Conversation with Judge Holloway**

12.     On February 7, 2022, two Notices of Public Hearing ("Public Notices") appeared in *The Paducah Post*, the weekly newspaper in Paducah, Texas. The Public Notices concerned the proposed creation of two reinvestment zones for tax abatement in Cottle County, Texas: one zone would be known as Cottle County Reinvestment Zone-TX 144 and the other as Cottle County Reinvestment Zone-TX 145 (hereinafter, collectively, "Reinvestment Zones"). The applications were filed by two entities: Innovative Solar 144 and Innovative Solar 145, respectively.

13.     Innovative Solar 144 and Innovative Solar 145 also filed applications for tax abatement with Cottle County relating to the Reinvestment Zones. The Public Notices advised that the Cottle County Commissioners Court would conduct a Public Hearing on March 14, 2022, to consider the applications for creation of the Reinvestment Zones and applications for tax abatement filed by Innovative Solar 144 and Innovative Solar 145.

14.     The Public Notices that appeared in *The Paducah Post* included an aerial view of the +/- 3200 acres of land that would be included in the proposed Reinvestment Zones, as well as

a list of the respective landowners of the identified land.  The land lies just on the southern edge of the city limits of Paducah, Texas. The proposed Reinvestment Zones included 495.74 acres of land owned by the WQR Estate.  The proposed Reinvestment Zones also listed two tracts of land owned by Ronald R. & Alyson Richards: Parcel ID 1979, comprised of what the applicants listed as 603.83 acres; and Parcel ID 14176, comprised of what the applicants listed as 113.19 acres.

15.      Lara K. Richards, executrix of the WQR Estate, read the Public Notices in the newspaper and was shocked to discover that the Estate's land had been included in the proposed Reinvestment Zones as no representative from Innovative Solar 144 or Innovative Solar 145 had discussed the proposed Reinvestment Zones or proposed tax abatement agreements with her or had otherwise discussed any aspect of these or any projects with her. Ms. Richards promptly contacted Cottle County Judge, Karl Holloway (hereinafter, "Judge Holloway"), for information about the projects.

16.      Judge Holloway provided Ms. Richards with an overview of the projects. He said that the Biddy Family – specifically, Prentiss D. and Ira Dell Biddy and their son, Robert Doyle "Bob" Biddy – had entered into solar farm lease agreements with Innovative Solar 144 and Innovative Solar 145 regarding their respective land (collectively, the "Biddy Land"). Judge Holloway explained to Ms. Richards that Innovative Solar 144 and Innovative Solar 145 planned to construct solar farms on the Biddy Land pursuant to those solar farm lease agreements. According to Judge Holloway, the projects would be comprised solely of two separate solar farms: one on the elder Biddy's land, which is located west of the Estate's land; and the other on Bob Biddy's land, which adjoins the Estate's land to the east.

17.      Judge Holloway explained that Innovative Solar 144 and Innovative Solar 145 had applied for the designation of the Reinvestment Zones so the companies could then qualify for tax

abatements for the two solar farm projects. Judge Holloway assured Ms. Richards that the projects consisted solely of two solar farms that would be located solely on the Biddy Land and that the related tax abatements would likewise involve only the Biddy Land.

18.     Ms. Richards asked Judge Holloway to explain why the WQR Estate was included in the proposed Reinvestment Zones if the projects and related tax abatement agreements would be limited solely to the Biddy Land. Judge Holloway explained that since the Biddy Land was not contiguous, including the Estate's land in the Reinvestment Zones was necessary. He also stated that including the Estate's land would make the projects more viable and would help ensure the solar farm projects were pursued and ultimately completed. Judge Holloway stressed that the solar farm projects would have a positive impact on the community and the county's tax base, and he, therefore, encouraged Ms. Richards to support the projects for the benefit of the county.

19.     Importantly, Judge Holloway repeatedly assured Ms. Richards that the Reinvestment Zones and related tax abatement agreements were proposed solely for two solar farm projects; that these agreements would have absolutely no impact on the WQR Estate's land and would not, in any way, affect the Estate's taxes; and that the Estate's land would not be included in the tax abatement agreements.

20.     Based on the representations from Judge Holloway about the scope of the projects – *i.e.*, that they solely concerned two solar farms to be constructed and operated solely on the Biddy Land – and the lack of anticipated impact on the Estate's land, Ms. Richards told Judge Holloway that she would not object to the creation of the Reinvestment Zones at the upcoming Public Hearing, nor would she object to the Estate's land being included in the Reinvestment Zones.

**B. The March 14, 2022, Public Hearing**

21.     A Public Hearing was held on March 14, 2022, concerning the applications that Innovative Solar 144 and Innovative Solar 145 had filed to create the Reinvestment Zones in Cottle County and to enter into tax abatement agreements regarding the projects. At the hearing, Ross Metersky, who was introduced as a representative from Innovative Solar 144 and Innovative Solar 145, told attendees about the two proposed projects, which were introduced initially as merely proposed solar farms.

22.     Shockingly, however, after Mr. Metersky discussed the proposed solar farm projects, Judge Holloway asked Mr. Metersky to explain that the projects were "not just solar," even though Judge Holloway had told Ms. Richards that the projects were "just two solar farms." Mr. Metersky continued his presentation to the attendees by explaining that the Cottle County projects could also include data mining and data storage.

23.     The handful of attendees at the Public Hearing asked Mr. Metersky many questions regarding the Cottle County projects, but Mr. Metersky provided nothing more than incomplete and misleading information in order to hide the true intentions of the Defendants. For instance, when an attendee asked Mr. Metersky to explain the data mining part of the project, Mr. Metersky provided only a brief statement that it was "just a bunch of computers . . . It's bitcoin and crypto currency, and that is all I can – I can explain about it." When the attendee further probed, asking whether the data mining "will be a warehouse full of computers and servers," Mr. Metersky replied simply: "Yeah, it could be."

24.     An attendee asked Mr. Metersky about the odds of data mining and data storage being added to the Cottle County projects. Mr. Metersky again offered only noncommittal statements regarding the likelihood of data mining coming to the county. He stated: "It's a lot of

things have to happen, but that could happen, yeah. We are in development companies – my boss

asks me when I'm on a project, they like to put percentages on them, and I can't . . ."

25.     Attendees asked Mr. Metersky for specific information about the location of the

projects and how they would be constructed, including, "How close will they be to town?" and

whether the projects would have any effect on wildlife. Mr. Metersky generally referenced the

proposed areas of the project, but he provided no specific information regarding the planned layout

or location of the projects.

26.     When asked about the large size of the Reinvestment Zones, Mr. Metersky

explained that the zone was larger than the actual planned project areas because "the idea of the

zone was the – there is transmission lines, and just to give us some flexibility within the area . . .

." He continued his misleading statements: "[M]y approach with projects is to make them a little

bit bigger, the zones, to give – to allow flexibility because you don't know –you know, you might

decide to make it subject to – a lot of it is driven by the electric power lots and what we can

ultimately put on the grid. And you know, if we can get a little more than we initially thought, then

we will try to make the project a little bit bigger without having to come back through the process."

27.     Attendees were also curious about the ownership of the projects, and whether that

could change in the future. An attendee asked Mr. Metersky about the chances of the Cottle County

projects being sold, to which he replied: "These – we have three that are bundled, that are

partnered. We have an investment partner. And that decision will be made after it's operational."

28.     Notably, throughout the entire Public Hearing, Mr. Metersky failed to correct the

misrepresentation that he was a representative from Innovative Solar 144 and Innovative Solar

145.

29.     After the Public Hearing, the Cottle County Commissioners approved the formation of the Reinvestment Zones and approved and executed two tax abatement agreements: Tax Abatement Agreement Between Cottle County, Texas and Innovative Solar 144, LLC; and Tax Abatement Agreement Between Cottle County, Texas and Innovative Solar 145, LLC (hereinafter, collectively, "Tax Abatement Agreements").

### C. Ms. Richards Uncovers the Misrepresentations and Omissions Regarding the Projects

30.     After the Public Hearing, Ms. Richards began hearing rumors about the projects, namely that Cottle County residents were under the mistaken impression that the solar farm projects were happening on the WQR Estate's land. Ms. Richards reached out to Judge Holloway for clarification, and he again assured Ms. Richards that the project's scope consisted solely of two solar farms to be constructed and operated solely on the Biddy Land.

31.     Seeking further assurance, Ms. Richards asked Judge Holloway to send her the documentation that the solar farm companies had submitted to Cottle County in conjunction with their applications for the creation of the Reinvestment Zones and the Tax Abatement Agreements. Judge Holloway emailed Ms. Richards the two Tax Abatement Agreements, as well as the Application for Tax Abatement filed by Innovative Solar 144 and the Application for Tax Abatement filed by Innovative Solar 145 (hereinafter, collectively, "Tax Abatement Applications"). Judge Holloway also emailed Ms. Richards the additional revenue projections that the solar farm companies had submitted to the County showing the purported revenue the solar farm projects would generate.

32.     Ms. Richards analyzed the documents and immediately realized the grave and imminent danger the Estate's land faced – which dangers would be shared by all of the residents and landowners of Cottle County and the city of Paducah – as a result of Innovative Solar 144's

13

and Innovative Solar 145's material misrepresentations and omissions. The Defendants intended to construct massive data mining facilities to be located at the City Limits of Paducah – within walking distances of homes, churches, and the town's only cemetery.

33.     This was not simply two solar farm projects, as Ms. Richards had been repeatedly told.

### D.  The Tax Abatement Agreements Reveal the Depth of the Misrepresentations and Omissions

34.     The two Tax Abatement Agreements that the county executed with Innovative Solar 144 and Innovative Solar 145 revealed the true scope of the companies' nefarious plans, plans that the Defendants purposefully hid from the county in the Tax Abatement Applications.

35.     Innovative Solar 144 and Innovative Solar 145 filed Tax Abatement Applications with the county on January 31, 2022. Tucked beneath a half-page description of the companies' purported plans to construct a solar farm was a single line that read, "The project may also include battery storage and/or data mining." The rest of the eight-page Applications include information solely about the solar farm projects, including the expected capacity. Importantly, the Defendants provided estimated revenue projections only for the solar farm projects as part of the Applications in the respective Attachments 3.

33.     But the Tax Abatement Agreements, as well as the additional revenue projections also provided to the county, revealed the true scope and magnitude of the projects. As Section B of the Tax Abatement Agreement Between Cottle County, Texas and Innovative Solar 144 reads:

> Owner proposes certain improvements generally described as infrastructure with nameplate capacity necessary to generate and transmit approximately 45 megawatts (MW) of electricity related to a solar powered electric generation facility (the "Project"). Owner reserves the right, but is not obligated, to additionally improve the property with **some level of electrical storage capacity and/or data mining operations** that will be located within the Reinvestment Zone, such improvements in Cottle County and the Reinvestment Zone more particularly described and defined in this Agreement and herein collectively referred to as the

14

"Improvements." Not later than the date of COD, as defined herein, Owner will inform the County of its election **to install electrical storage and/or data mining capacity**, and the capital costs of such improvements.

The Tax Abatement Agreement Between Cottle County, Texas and Innovative Solar 145 contains similar language.

34.     Other sections of the Tax Abatement Agreements likewise reveal that the true scope of the projects includes data mining and electrical storage. For instance, Exhibit A to the Agreements titled "Project Description" includes a list of solar farm-related improvements planned for the projects but then ends with the following statement: "The project may also include battery storage and/or data mining. All improvements will be subject to the abatement."

35.     It was also clear that Innovative Solar 144's and Innovative Solar 145's plans in Cottle County extended beyond the boundaries of the Biddy Land, directly contradicting the statements Judge Holloway had made to Ms. Richards. Exhibit B to the Agreements titled "Project Map" denotes the entire +/- 3200-acre reinvestment zones as the "Project Map," and Exhibit C titled "Project Description" likewise lists all land included in the Reinvestment Zones, including the Estate's land.

36.     The Tax Abatement Agreements give the Defendants unfettered latitude and unilateral control regarding their planned activities and authorities in the Reinvestment Zones after the Agreements were executed.  For instance, Section B of the Tax Abatement Agreements begins by defining the "Project" as a "solar power electric generation facility." But the Agreements then provide that Innovative Solar 144 and Innovative Solar 145 may unilaterally broaden the scope of the project to include "electrical storage capacity and/or data mining operations" and places no boundaries or restrictions on that unilateral authority. Rather, Section B concludes that Innovative Solar 144 and Innovative Solar 145 will simply "inform" the county of their unilateral election to install electrical storage and/or data mining capacity in the future.

15

37.     In other words, once the county signed the Agreements, Innovative Solar 144 and Innovative Solar 145 had sole and unfettered authority to develop the land with data mining facilities and needed absolutely no additional inputs, consideration, or approval by the county to do so. No additional public hearings, no notices, no additional agreements, nothing. Once the county signed the Agreements, Innovative Solar 144 and Innovative Solar 145 were in full control.

38.     Upon information and belief, Innovative Solar 144 and Innovative Solar 145 also knew that the county has no zoning ordinances that could prevent a data mining facility from being constructed right next to the city limits – a literal stone's throw away from churches, homes, and the town's cemetery, and just a short walk to the county's only public school. Innovative Solar 144 and Innovative Solar 145 also knew that the county has no rules or regulations in place that would govern the construction of the facilities or monitor the companies' operation of the facilities once constructed.

39.     In fact, Innovative Solar 144 and Innovative Solar 145 expressly noted the lack of ordinances and regulations in the Road Use Agreements the companies entered into with the county regarding the projects:

> [T]here are **no applicable Cottle County rules or ordinances** that would require Innovative Solar 145, LLC to obtain zoning approval, a permit, or an authorization for the ownership, construction, operation or maintenance of a solar energy project and its Improvements within the Project Area. There are **no presently existing Cottle County rules or ordinances** . . . regarding decommissioning, safety buffer zones, set back requirements, noise restrictions, shade, flicker, shadow or visibility restrictions, or other zoning rules or regulations affecting the proposed ownership, construction, operation, or maintenance of Improvements within the Project Area.

40.     Importantly, the Project Description located in the Exhibit A of the Agreements expressly states: "The project may also include battery storage and/or data mining. All improvements will be subject to the abatement." This broad statement ensured that none of the

16

Defendants would ever have to go before the Cottle County Commissions Court again or hold another public hearing or seek any approvals at all to pursue their crypto mining ventures.

     **E.   VivoPower USA and Caret Enter the Picture, Further Revealing the Extent of the Misrepresentations and Omissions About the Projects' Scope**

41.     The Tax Abatement Agreements also revealed to Ms. Richards the involvement of a new and previously undisclosed entity – VivoPower USA. As noted above, the applications for the creation of the Reinvestment Zones and Tax Abatements had been filed by Innovative Solar 144 and Innovative Solar 145, respectively. The address listed for communications to the solar farm companies in the Tax Abatement Agreements, however, was directed to: c/o VivoPower USA, LLC, 44873 Falcon Place, Suite 174, Sterling, VA 20166. Likewise, the Tax Abatement Applications filed by Innovative Solar 144 and Innovative Solar 145 listed an email address with the domain name of "@vivopower.com" to contact the companies' representative.

42.     Ms. Richards researched VivoPower USA and discovered the website for another company, VivoPower International, billed as an "international battery technology, electric vehicle, solar, and critical power services company" on its website, http://vivopower.com.

43.     The emergence of VivoPower USA and VivoPower International – which Ms. Richards discovered only upon careful review of the executed Agreements – led to another outrageous discovery. On December 8, 2021 – four months **_before_** the Public Hearing in Cottle County -- VivoPower International had announced in a press release that it was entering the booming business of crypto mining through its subsidiary, Caret.

44.     In the press release titled "VivoPower Subsidiary, Caret, Announces LOI to Launch Renewable Powered Digital Asset Mining Business," VivoPower International announced "plans to start a crypto mining business through its subsidiary Caret, which **owns** solar power projects

throughout the U.S." (emphasis added). The press release further explained that Caret had "signed

a letter of intent to launch Caret Decimal, a renewable powered digital asset mining business."

45.     Shockingly, the December 2021 press release explained that VivoPower

International was committing solar sites in Texas to the data mining project. As the statement read:

"For the deal, Caret will contribute an initial 206 MW-CD of solar sites in Texas in exchange for

$20 million of equity in Caret Decimal. . . . In connection with the transaction, Caret will be

contributing an initial 206MW-DC of its ready to build solar power **from sites in Cottle and**

**Hardeman Counties, Texas.**" (emphasis added).

46.     The VivoPower International press release also listed Caret as the "owner" of the

Cottle County solar farm sites, and Caret likewise proclaims that it is the "owner" of the Cottle

County solar farm sites on its website.

47.     A review of the North Carolina Secretary of State's business registration website

also reveals that Innovative Solar 144 and Innovative Solar 145 filed to change their legal names

on December 28, 2021, well before they filed the application for tax abatement with the county

and months before the Public Hearing. The two entities are now legally known as Caret TX 144,

LLC and Caret TX 145, LLC, respectively, further revealing the ties to Caret and its crypto mining

endeavors.

48.     The involvement of VivoPower USA, VivoPower International, Caret, and Caret

Decimal, along with the December 2021 press release, make it abundantly clear the true scope of

the Cottle County projects. These are not just two solar farms, as Ms. Richards was told; the plan

is to build two massive data mining facilities directly adjacent to the city limits of Paducah, Texas.

**F.  A VivoPower February 2022 Presentation Further Revealed the Defendants' True Plans for Cottle County**

49.     In her research, Ms. Richards also discovered a presentation that VivoPower created that further sheds light on the Defendants' actual plans in the county. On February 24, 2022 – almost two months before the Cottle County Public Hearing – VivoPower released its Half-Year Results Presentation for the Six Months Ended December 31, 2021. In the presentation, VivoPower noted that it had seen a "[s]ignificant increase in interest from cryptocurrency mining hosting firms and miners[,]" and it referenced the letter of intent with Caret Decimal to contribute the two Cottle County sites to the new cryptomining venture.

50.     But the February 2022 presentation also included actual drawings of the planned Cottle County projects, including the number of initial data center containers that would be placed on each solar farm site, as well as the data center capacity capabilities on each site, as seen in the drawings below:



TX-145 | Site 1, Cottle County

## TX-144 | Site 2, Cottle County



51. The February 2022 presentation explained that the "[r]enewable solar energy powers the cryptomining operations, with option to sell power to grid during high demand/high power price periods." The presentation made it abundantly clear that the Defendants did not intend to construct standalone solar farms and then decide, at a later time, whether or not to add crypto mining. Instead, the Cottle County projects were a combination solar farm/crypto mining projects from Day 1. Upon information and belief, the Defendants planned to construct the Cottle County solar farms **only if** they could include crypto mining, and, in fact, the Defendants would never construct a standalone solar farm in the county because it is unfeasible and undesirable due to limitations of putting additional generated electricity onto the existing grid.

### G. The Defendants Misrepresented the Scope and Likelihood of the Defendants' Crypto-Mining Plans

52.     Ms. Richards was repeatedly told that Innovative Solar 144's and Innovative Solar 145's projects in Cottle County were just two solar farms to be construed and operated only on the Biddy Land. She had no idea about the involvement of all of the Defendants in the Cottle County projects or their true intentions – namely to build two massive crypto mines – as evidenced by the December 2021 press release and the February 2022 earnings presentation.

53.     Ms. Richards was also told that the Estate's land needed to be included in the Reinvestment Zones because the Biddy Land was not contiguous. At the Public Hearing, however, the Defendants' representative, Mr. Metersky, explained that he liked to "make [reinvestment zones] a little bit bigger" to give the developers the flexibility to expand in the future. He also stated that because of the transmission lines -- which happen to run across the Estate's land – that making the Reinvestment Zones larger gave the developers more "flexibility." Mr. Metersky's explanation for including the Estate's land had nothing to do with the need for project land to be contiguous to make the project viable, as Ms. Richards was told; rather, it stemmed from the fact that the developers hoped to expand onto the Estate's land in the future.

54.     Ms. Richards was repeatedly told that the Cottle County projects were "just two solar farms." But as evidenced by the December 2021 press release and especially the February 2022 presentations, the projects were always intended to be combination solar farm/crypto mine projects. In fact, upon information and belief, the Defendants would never construct a stand-alone solar farm project in the county because limitations on the existing electric grid make a stand-alone project unfeasible.

55.     Attendees at the March 2022 Public Hearing were also entirely misled about the possibility of crypto mining coming to their community. As recounted above, Mr. Metersky told

attendees that he "can't explain about it" when expressly asked to explain what cryptomining was. And when directly asked about the likelihood of data mining coming to the county, he said he couldn't put a percentage on it. The reality, as noted above, is that the Cottle County projects had been committed to a new crypto-mining business venture in December 2021, and the solar farms would be constructed only if the crypto mining facilities were also built.

56.     Mr. Metersky was also asked about the likelihood of the projects being sold in the future. Mr. Metersky noted that three projects were "packaged" together, but he wholly omitted the fact that VivoPower International had already signed a Letter of Intent committing the projects to Caret Decimal, a new business venture into crypto mining.

57.     Mr. Metersky had ample opportunity to explain the true names of the developers of the projects in Cottle County and their true intentions; yet, he continued to misrepresent and omit material facts about the project in his discussions with local residents. Even though the possibility of data mining was discussed at the March 2022 Public Hearing, at no time did Mr. Metersky discuss the two documents discussed above or fully disclose to the attendees the Defendants' plans as discussed in-depth in these documents.

58.     In fact, Mr. Metersky was directly asked for specific information that is found in these two documents; nevertheless, he constantly avoided giving the attendees accurate and complete information. Quite frankly, it is baffling how the Defendants could provide detailed discussion of these projects to their investors via the press release and earnings statement -- and file these intentions as part of their disclosures to the Securities and Exchange Commission -- and yet wholly omit this same information when directly asked by the very community where these projects would be constructed.

### H. The Defendants Misrepresented That the Tax Abatement Agreements Covered Only the Biddy Land

59.     Ms. Richards was repeatedly told that the Tax Abatement Agreements the county would execute with Innovative Solar 144 and Innovative Solar 145 would involve only the Biddy Land.

60.     A careful review of the Tax Abatement Applications and the Agreements themselves, however, reveals that the tax abatement applies to the full scope of the +/- 3200 acres in the Reinvestment Zones, which includes thousands of acres of land not leased by either Innovative Solar 144 or Innovative Solar 145. Upon information and belief, and confirmed on the Caret's website, Innovative Solar 144 has only +/- 440 acres leased with the Biddy Family, and Innovative Solar 145 has +/- 330 acres leased with the Biddy Family. This means that only one-quarter of the +/-3200 acres in the Reinvestment Zones was actually leased by Innovative Solar 144 and Innovative Solar 145 when the Tax Abatement Applications were filed and the Tax Abatement Agreements were executed.

61.     There is no mention in the Agreements of any leases with the Biddy Family, and there is no limiting language in the Agreements that even mentions the existence of a lease with landowners.  Ms. Richards had been repeatedly told by Judge Holloway that the Tax Abatement Agreements would involve only land that the solar farm companies had under lease. However, it is clear that the Agreements are not limited to the Biddy Land. And this makes sense, given that the Defendants' representative explained that the developers might want to expand the project in the future – onto the Estate's land. As such, the Defendants wanted the Reinvestment Zones and Tax Abatement Agreements to cover as wide a swath of land as possible so that the Defendants never had to go before the County for additional approval in the future.

62.     Importantly, the WQR Estate has never executed a lease agreement, entered into any negotiations regarding such an agreement, or even discussed the possibility of such an agreement with Innovative Solar 144, Innovative Solar 145, or any of the Defendants in this matter. And yet, Innovative Solar 144 and Innovative Solar 145 executed two agreements with the county that are not limited to land the developers currently have under lease.

I.    **The Defendants Misrepresented and Omitted the True Identities of the Projects' Developers**

63.     The Tax Abatement Applications were filed by Innovative Solar 144 and Innovative Solar 145, respectively, on January 31, 2022. As noted above, however, these two companies had legally changed their names to Caret TX 144 and Caret TX 145, respectively, as of December 28, 2021, a full month before the Cottle County applications were filed.

64.     The Public Notices that appeared in *The Paducah Post* on February 7, 2022, likewise listed Innovative Solar 144 and Innovative Solar 145 as the applicants for the Reinvestment Zones and Tax Abatement. Likewise, a representative from what the public thought was Innovative Solar 144 and Innovative Solar 145 discussed the projects at the Public Hearing on March 14, 2022, even though Mr. Metersky had ample opportunity to explain to the attendees who he really worked for and the companies that were actually developing the Cottle County projects.

65.     The Tax Abatement Agreements that the County signed on March 14, 2022, also listed Innovative Solar 144 and Innovative Solar 145 as the respective co-parties to the Agreements.

66.     Caret TX 144 and Caret TX 145 misrepresented and omitted their true identities in all representations to Cottle County and its residents, including Ms. Richards, in order to conceal

24

the crypto-mining ventures planned by VivoPower USA, VivoPower International, Caret, and Caret Decimal.

67.     Innovative Solar Systems and Innovative Solar Ventures also materially contributed to the misrepresentations and omissions by allowing their names to be associated with the Cottle County projects. The name "Innovative Solar" misled Cottle County residents, including Ms. Richards, into believing that the planned projects were indeed just two solar farms. In fact, Innovative Solar Systems' website discusses only solar farm development projects – there is no mention of data mining and/or electrical storage projects.

### J.  Sadly, Cottle County's Story is Occurring In Rural Communities Across the Nation

68.     The Defendants' misrepresentations and omissions occurring in Cottle County right now are unfortunately not unique. Crypto-mining operations are quickly exploiting impoverished communities all over rural America and beyond, as detailed in numerous recent news reports. Disputes and lawsuits are developing between the crypto mines, on the one hand, and local governments and residents who had no idea that a crypto mine project was coming to their communities.

69.     Upon information and belief, crypto-mining is the process by which computers perform complex mathematical calculations to "mine" or generate new cryptocurrency. Crypto mines require massive amounts of energy, which leads to opposition regarding energy consumption and its effects on the environment. The New York Legislature, for instance, recently passed a two-year limited moratorium on digital currency mining at fossil fuel power plants.

70.     Upon information and belief, in addition to massive energy consumption, crypto mines also produce massive amounts of noise from the cooling fans that run 24/7 to keep the computers cool. As detailed in news reports, residents who are fighting back against the crypto-

mining companies have compared the crypto-mine cooling fans to "a jet engine idling on a nearby tarmac" and "a giant dentist drill that won't stop," for instance.

71.     If constructed, the two data mining facilities in Cottle County would be built on the edge of Paducah's city limits. One of the sites is directly across from the Church of St. Elizabeth and the town's only cemetery, and merely hundreds of feet from the country home of Regina Richards, widow of William Q. Richards. The other site is within walking distance from the Church of Christ. Both sites neighbor dozens of homes of the town's residents and are just a short mile's walk to the town's only public school.

72.     Upon information and belief, the data mines would create significant disruption, decrease quality of life, and make property values plummet, especially for the Estate. In a town that already struggles to maintain its tiny population, much less attract new residents, making Paducah's residents suffer such noise pollution – and doing so through misrepresentations and omissions to county residents about the companies' true intentions – is unconscionable.

73.     As detailed in news articles, many rural communities have unfortunately learned of crypto mines in their communities only **after** the mines have already been constructed.  But the WQR Estate has learned of the Defendants' massive crypto-mining venture in Cottle County on the eve of construction. According to the Agreements, construction on the Cottle County projects is set to begin in 2022.

K.  **The Reinvestment Zones Incorrectly Include Richards Family Land Located Within the Paducah City Limits**

74.     The Reinvestment Zones are invalid and unenforceable because they include Richards Family land that lies within the Paducah City Limits.

75.     Sec. 312.401 of the Texas Property Redevelopment and Tax Abatement Act provides that "[t]he commissioners court of a county eligible to do so under Section 312.002 by

order may designate as a reinvestment zone an area of the county that does not include area in the taxing jurisdiction of a municipality." Thus, a reinvestment zone established under Section 312 by a county cannot include land that lies within the city limits of a municipality.

76.     In Article 4 of the Tax Abatement Agreements, the County represented "that the property within the Reinvestment Zone and the Site is located within the legal boundaries of the County and **outside the boundaries of all municipalities located in the County**." (emphasis added) Thus, even the County recognized the importance of that restriction.

77.     The Reinvestment Zones include two tracts of land owned by Ronald R. & Alyson Richards: Parcel ID 1979, comprised of what the Defendants listed as 603.83 acres; and Parcel ID 14176, comprised of what the Defendants listed as 113.19 acres. This acreage includes land that lies in the City Limits.

78.     Parcel ID 1979 refers to land in Section 1, B.S. & F. Ry Co., Abstract No. 59, and Parcel ID 14176 refers to land in Section 1, D.H. Jones, Abstract No. 662. At the northern edge of this land, the couple owns a row of city blocks that lies within the City Limits of Paducah, as reflected on their tax statements. The city blocks, and their corresponding acreage, are:

| | |
|---|---|
| RA BLOCK 10 | 1.9 |
| RA BLOCK 11 | 1.9 |
| RA BLOCK 12 | 1.6 |
| RA BLOCK 13 | 1.6 |
| RA BLOCK 14 | 1.6 |
| RA BLOCK 15 | 1.6 |
| RA BLOCK 16 | 1.6 |
| RA BLOCK 17 | 1.72 |
| RA ALL OF BLK 46 | 1.72 |
| **TOTAL ACREAGE** | **15.24** |

79.     All of R.A. Blocks 10-16, as well as 0.76 acres of R.A. Block 17, are located in the area that abuts the county land in Section 1, D.H. Jones, Abstract No. 662. Correspondingly, 0.96

acres out of Block 17 and all of Block 46 abut the county land in Section 1, B.S. & F. Ry. Co., Abstract No. 59.

80.     Upon information and belief, all of R.A. Blocks 10-16, as well as 0.76 acres of Block 17, are located in the area that abuts the county land in Section 1, D.H. Jones, Abstract No. 662. Correspondingly, 0.96 acres out of Block 17 and all of Block 46 abut the county land in Section 1, B.S. & F. Ry. Co., Abstract No. 59.

81.     Taking the city lots into account, Ronald R. & Alyson Richards own 113.29 acres of land in Section 1, D.H. Jones, Abstract No. 662 and only 603.73 acres of land in Section 1, B.S. & F. Ry. Co., Abstract No. 59 that lie outside of the City Limits. Thus, when the Reinvestment Zones included 603.83 acres of land in Section 1, B.S. & F. Ry. Co., Abstract No. 59, this improperly and illegally included 0.10 acres of R.A. Block 17 in the Reinvestment Zones, which is a violation of state law.

## V.  CAUSES OF ACTION

### COUNT I: ACTION TO NULLIFY AND/OR DECLARE
### THE REINVESTMENT ZONES VOID

82.     The Plaintiff re-alleges each of the foregoing paragraphs as if fully stated herein.

83.     Section 312.401 of the Texas Property Redevelopment and Tax Abatement Act states that a county "may designate as a reinvestment zone an area of the county that **does not** include area in the taxing jurisdiction of a municipality." (emphasis added)

84.     As noted above, the county has improperly and unlawfully designated Richards Family land as part of the Reinvestment Zones that lies within the City Limits of Paducah, Texas. The County has included 0.10 acres of land that reside in R.A. Block 17 in both Reinvestment Zones.

85.     As such, Cottle County Reinvestment Zone-TX 144 and Cottle County Reinvestment Zone-TX 145 should be declared void.

## COUNT II: ACTION TO NULLIFY AND/OR DECLARE
## THE TAX ABATEMENT AGREEMENTS VOID

86.     The Plaintiff re-alleges each of the foregoing paragraphs as if fully stated herein.

87.     Because the County has improperly and unlawfully created two Reinvestment Zones that include land that lies within the City Limits of Paducah, any tax abatement agreements that the County executed relating to those reinvestment zones should also be declared void.

88.     Notwithstanding the invalidity of the Reinvestment Zones, however, the Tax Abatement Agreements themselves are also invalid because they are not limited to land the Defendants currently have leased.

89.     Section 312.402 of the Texas Property Redevelopment and Tax Abatement Act expressly provides that there are only two types of people/entities with which a county may contract regarding a tax abatement agreement for real property located in a Reinvestment Zone:

(a) The commissioners court may execute a tax abatement agreement with the **owner** of taxable real property located in a reinvestment zone . . .

\*\*

(a-3) The commissioners court may execute a tax abatement agreement with a **lessee** of taxable real property located in a reinvestment zone . . .

Clearly, a county may enter into a tax abatement agreement under this Section only with the **owner** of the real property or a **lessee** of the real property.

90.     Neither Caret TX 144, Caret TX 145, nor any of the other Defendants own the WQR Estate's land, and none of the Defendants have entered into a lease agreement with the WQR Estate regarding its land.

91.     While Section 312.402 allows a county to enter into a tax abatement agreement "with the owner of tangible personal property located on real property in a reinvestment zone," the lack of ownership and/or lease agreement between any of the Defendants and the WQR Estate means that the Tax Abatement Agreements should not include the WQR Estate's land.

92.     Currently, the Tax Abatement Agreement "Project Map" references the full +/- 3,200 acre Reinvestment Zone as the "Project Map," and the "Project Description" likewise lists all land included in the Reinvestment Zones, including the Estate's land.

93.     As such, the Tax Abatement Agreement between Cottle County, Texas, and Innovative Solar 144, as well as the Tax Abatement Agreement between Cottle County, Texas, and Innovative Solar, 145, should be declared void.

### COUNT III: NEGLIGENT MISREPRESENTATION

94.     The Plaintiff re-alleges each of the foregoing paragraphs as if fully stated herein.

95.     Under Texas law, the elements for a claim of negligent misrepresentation include: "(1) defendant's representation to a plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) defendant's providing false information for the guidance of others; (3) defendant's failure to exercise reasonable care or competence in obtaining or communicating information; (4) plaintiff's justifiable reliance on defendant's representation; and (5) defendant's negligent misrepresentation proximately causing the plaintiff's injury." *Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. App. 2013).  The Plaintiff has demonstrated each of these elements.

96.     Defendants repeatedly misrepresented and omitted their true identities and their actual planned projects in Cottle County, as detailed above. The Defendants purposefully and

deliberately hid their identities and the involvement of additional parties so that residents of Cottle County, including Ms. Richards, could not detect the Defendants' true identities or plans.

97.    As discussed above, in December 2021, the Defendants announced in a press release that they were committing the two Cottle County solar farms to a new business venture into crypto mining and had signed a letter of intent to transfer the projects to the new venture called Caret Decimal. In February 2022, VivoPower International presented detailed drawings and plans for the combination crypto mine/solar farm projects in Cottle County, noting that the electricity generated by the solar farms would flow directly to the crypto mines.

98.    Upon information and belief, the Defendants would never construct a standalone solar farm project in the county due to limitations on the existing electric grid and the unfeasibility and profitability of a standalone solar farm project.

99.    And yet, in March 2022, a representative from what the public thought was Innovative Solar told attendees at a Public Hearing that the Cottle County projects were solar farms and that data mining was merely a possibility, not a requirement. The true scope of the Defendants' crypto-mining plans was never told to Cottle County residents, including Ms. Richards.

100.   The true identities of the solar farm developers; the involvement of VivoPower USA, VivoPower International, Caret, and Caret Decimal; the December 2021 press release regarding the planned use for sites; and the February 2022 presentation that included actual drawings and further details on the plans for Cottle County were all material facts that the Defendants withheld from the citizens of Cottle County, including Ms. Richards, with the goal of misleading the public about the Defendants' true intentions for the projects.

101.   Ms. Richards relied on the representations regarding the Defendants' identities and the projects' limited scope when she supported the applications for the creation of the

Reinvestments Zones and for tax abatement filed by two companies she thought were named Innovative Solar 144 and Innovative Solar 145. She did not object to 495.74 acres of the Estate's land being designated as part of the Reinvestment Zones.

102.    Ms. Richards reasonably believed that Innovative Solar 144 and Innovative Solar 145 planned to construct and operate only two solar farms on the Biddy Land. Instead, two previously unknown companies called Caret TX 144 and Caret TX 145 intend to construct two solar farms that will power two massive crypto-mining facilities.

103.    Ms. Richards also believed that the Tax Abatement Agreements would include only the Biddy Land. Instead, Innovative Solar 144 and Innovative Solar 145 executed agreements that include the Estate's land, despite being neither an owner nor lessee of that land, in direct violation of Texas law.

104.    The Defendants' misrepresentations and omissions directly led to the Estate's injuries, namely that the Estate's land is currently included in two Reinvestment Zones that were secured by the Defendants' misrepresentations and omissions, and the Estate's land was improperly included in the Tax Abatement Agreements, in contravention of Texas law.

## VI.  PRAYER

105.    WHEREFORE, the WQR Estate respectfully requests that, after due proceedings, including a trial by jury, the Court enter the following judgments:

   a)   Declaring the Reinvestment Zones void under Texas law;

   b)   Declaring the Tax Abatement Agreements void under Texas law;

   c)   Awarding damages, including punitive damages, in the WQR Estate's favor against all Defendants, jointly and severally;

d) Awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

e) Awarding any and all other relief as may be just and equitable.

Respectfully submitted,


/s/ Jason W. Burge
Jason W. Burge
TX Bar No. 24112316
Lara Richards (admitted *pro hac vice*)
SBN (LA) 34054
FISHMAN HAYGOOD LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jburge@fishmanhaygood.com
lrichards@fishmanhaygood.com

*Counsel for Plaintiff*